313 F.2d 472
 Ralph J. TAUSSIG and Sally G. Taussig, His Wife, as Tenants by the Entireties
v.
WELLINGTON FUND, INC., Wellington Equity Fund, Inc., the Wellington Company, and Wellington Company, Ltd., Delaware Corporations.
Wellington Equity Fund, Inc., the Wellington Company, Wellington Company, Ltd., Appellants in 13,702, Wellington Fund, Inc., Appellant in 13,703, Ralph J. Taussig and Sally G. Taussig, His Wife, as Tenants by the Entireties, Appellants in 13,704 and 13,705.
 Nos. 13702-13705.
 United States Court of Appeals Third Circuit.
 Submitted July 23, 1962.
 Decided January 23, 1963.
 
 Richard F. Corroon, Wilmington, Del. (Berl Potter & Anderson, Wilmington, Del., on the brief), for appellant Wellington Fund, Inc., in No. 13703 only.
 Daniel Mungall, Jr., Philadelphia, Pa. (Stradley, Ronon, Stevens & Young, Philadelphia, Pa., on the brief), for appellants in Nos. 13702 & 13703 and for appellees in Nos. 13704 and 13705.
 Edwin P. Rome, Philadelphia, Pa. (Blank, Rudenko, Klaus & Rome, Philadelphia, Pa., Morris Relson, William F. Dudine, Jr., Darby & Darby, New York City, Morris L. Weisberg, Philadelphia, Pa., Floyd H. Crews, Harvey W. Mortimer, New York City, William E. Taylor, Jr., Wilmington, Del., on the brief), for Ralph J. Taussig and Sally G. Taussig, appellants in Nos. 13704 and 13705; and appellees in Nos. 13702 and 13703.
 Peter A. Dammann, Gen. Counsel, David Ferber and Walter P. North, Assoc. Gen. Counsels, George P. Michaely, Jr., Sp. Counsel, Donald R. Jolliffe, Atty., Securities and Exchange Commission, Washington, D. C., on the brief for amicus curiae.
 Before KALODNER, HASTIE and SMITH, Circuit Judges.
 HASTIE, Circuit Judge.
 
 
 1
 In this stockholders' derivative suit the district court decided that the adoption and use of the name "Wellington" by Wellington Equity Fund, an openend, diversified, management investment company, constituted unfair competition in relation to Wellington Fund, Inc., a similar enterprise which had become well and favorably known as a large, active and successful mutual fund long before the 1958 organization of Wellington Equity Fund as a new investment company.
 
 
 2
 The plaintiffs are stockholders of Wellington Fund, Inc., and sue in the interest of that corporation and its stockholders, although the corporation itself is formally designated as a defendant. The other defendants, against whom relief is sought, are the above mentioned Wellington Equity Fund and two related enterprises. Defendant Wellington Co., Ltd., is the investment adviser of Wellington Equity Fund. Defendant Wellington Co. is sued as distributor of both Wellington Fund and Wellington Equity Fund, and as investment adviser of Wellington Fund.[1] All of the defendants are Delaware corporations.
 
 
 3
 The complaint charged that the adoption and use of the name "Wellington" by Wellington Equity Fund constituted both an actionable violation of federal rights derived from the Investment Company Act of 1940, 54 Stat. 789, 15 U. S.C. § 80a-1 et seq., and a violation of the common law[2] of unfair competition. The same relief, an injunction and monetary recovery, was sought under both the statutory claim and the common-law claim.
 
 
 4
 Diversity of citizenship not having been established, the district court found in the complaint an assertion of federal question jurisdiction, adequate under the doctrine of pendent jurisdiction to permit the consideration of the common-law claim as well. Relief was then granted solely upon the common-law claim. 187 F.Supp. 179, 220. More particularly, Wellington Equity Fund was enjoined from using the name "Wellington", and the advisory and distributing corporations were enjoined from using that name with reference to any investment company other than Wellington Fund. The prayer of the plaintiffs for damages and an accounting was denied. Wellington Equity Fund and the two associated corporations have appealed from the granting of injunctive relief. The plaintiffs have appealed from the denial of damages and an accounting.
 
 
 5
 Jurisdiction is our first concern. The alleged violation of the common law of unfair competition, standing alone, would not have been within federal jurisdiction. But here, the coupling of this basis of recovery with a contention that the conduct of the defendants also violated federal statutes is said to bring the alleged violation of state law within the so-called pendent jurisdiction of a federal court.
 
 
 6
 Decision on this jurisdictional point is simplified in this case by the fact that the relief sought is the same on both legal grounds. Moreover, this case does not involve the often vexatious question whether the factual basis for federal statutory relief is substantially different from the factual basis of the asserted common-law right or, as the issue is often stated, whether the suit presents a single cause of action. Here, it is clear that essentially the same facts are relevant whatever the liability-creating law may be. The one issue requiring discussion is whether the asserted federal statutory claim is substantial enough to justify the adjudication of the coupled common-law claim. In other words, the debatable matter is whether federal question jurisdiction is established as a basis for ancillary jurisdiction.
 
 
 7
 The leading cases on pendent jurisdiction hold that an actual right to relief under some federal statute need not be established to justify adjudication of the merits of a coupled common-law claim. Hurn v. Oursler, 1933, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148; Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 1938, 305 U.S. 315, 59 S.Ct. 191, 83 L.Ed. 195. The common-law claim must be dismissed only if the coupled federal contention is "plainly unsubstantial either because obviously without merit, or `because its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy.'" Levering & Garrigues Co. v. Morrin, 1933, 289 U.S. 103, 105-106, 53 S.Ct. 549, 550, 77 L.Ed. 1062. See also Bell v. Hood, 1946, 327 U.S. 678, 681-683, 66 S.Ct. 773, 90 L.Ed. 939.
 
 
 8
 Thus, we must consider whether such "unsubstantiality" characterizes the claim that the use of the name "Wellington" by Wellington Equity Fund violates a federal right derived from the Investment Company Act of 1940. In the court below the starting point for this inquiry was Section 35(d) of the statute, 54 Stat. 840, 15 U.S.C. § 80a-34(d), which provides:
 
 
 9
 "It shall be unlawful for any registered investment company hereafter to adopt as a part of the name or title of such company * * * any word or words which the Commission finds and by order declares to be deceptive or misleading. The Commission is authorized to bring an action in the proper district court of the United States or United States court of any Territory or other place subject to the jurisdiction of the United States alleging that the name or title of any registered investment company, or of any security which it has issued, is materially deceptive or misleading."
 
 
 10
 Under this section a district court would have jurisdiction to adjudicate a claim by the Securities and Exchange Commission that the use by one openend, diversified, management investment company of an identifying part of the name of another should be enjoined in order to avoid harm resulting from the confusion of investors as to the identity of either fund or the investment opportunity it offers to the general public. But this is just the beginning of the reasoning required to establish federal question jurisdiction over the present private civil suit. The plaintiffs must argue that once the federal statute has made it legally wrong for an investment company to adopt a name that is materially deceptive or misleading, it is within the authority of a federal court to provide a civil remedy to anyone aggrieved by that wrong, even though the special remedy Congress has provided for the wrong is of a different character. It is arguable on the one hand that in this situation it should be implied that the remedy provided by Congress is exclusive, as has been done with reference to the National Labor Relations Act. Cf. Amalgamated Util. Workers v. Consolidated Edison Co., 1940, 309 U.S. 261, 60 S.Ct. 561, 84 L.Ed. 738. On the other hand, it is arguable, as has been held in certain cases under the Securities Exchange Act of 1934, that a court may properly afford civil relief to a person injured by deceptive conduct which Congress has declared unlawful, even in the absence of an express provision for such a remedy. Cf. Baird v. Franklin, 2d Cir., 1944, 141 F.2d 238, 244-245, cert. denied 323 U.S. 737, 65 S.Ct. 38, 89 L. Ed. 591; Note, 1948, 61 Harv.L.Rev. 858.
 
 
 11
 More generally, it is frequently held that a breach of statutory duty which causes injury to one of the class that the statute serves to protect affords by implication a sufficient basis for a private civil suit by the injured party. Texas & Pac. Ry. v. Rigsby, 1916, 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874; Tunstall v. Brotherhood of Locomotive Firemen, 1944, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187. 2 Restatement, Torts § 286. To apply that doctrine here would require a conclusion that section 35(d) is legislation for the protection, not only of those contemplating investment, but also of investors and investment companies already in the field. Nothing has been pointed out in the legislative history of the Investment Company Act of 1940 which bears upon this point, and it may reasonably be doubted whether Congress adverted to it. However, congressional contemplation of implied private rights of action may be suggested by a provision of section 44 of the Act, 54 Stat. 844, 15 U.S.C. § 80a-43, giving the district courts jurisdiction "of all suits in equity and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of" the Act. No provision of the Act expressly grants private rights of action, yet the quoted language seems to provide a forum for such suits.
 
 
 12
 The sum of all of this is that it is legally debatable whether the right which plaintiffs assert can properly be derived from the Investment Company Act of 1940. For conflicting views of a similar question under another section of the Act, contrast Brown v. Bullock, 2d Cir., 1961, 294 F.2d 415, with Brouk v. Managed Funds, Inc., 8th Cir.1961, 286 F. 2d 901, vacated as moot, 1962, 369 U.S. 424, 82 S.Ct. 878, 8 L.Ed.2d 6. Certainly such a contention is not frivolous. It is not foreclosed by any decision of the Supreme Court. And finally, it would be particularly difficult for this court to deny the substantiality of the contention since we have recognized the existence of an implied private right to relief in somewhat analogous circumstances under the Securities Exchange Act of 1934. See Slavin v. Germantown Fire Ins. Co., 3 Cir. 1949, 174 F.2d 799; Speed v. Transamerica Corp., 3 Cir., 1956, 235 F.2d 369, aff'g D.Del.1951, 99 F.Supp. 808, Id., D.Del.1947, 71 F.Supp. 457. We hold, therefore, that the district court had federal question jurisdiction over the cause of action asserted under section 35(d) of the Investment Company Act of 1940 and pendent jurisdiction to determine whether the conduct in suit constituted common-law unfair competition.
 
 
 13
 We come now to the merits of the unfair competition claim. In substance, the court below found (1) that in the investment company field valuable good will attached to and was symbolized by the name "Wellington", (2) that this good will was property of Wellington Fund which could not lawfully be appropriated by a new investment company calling itself Wellington Equity Fund and (3) that the consent of the directors of Wellington Fund to this appropriation was invalid.
 
 
 14
 For many years before 1958, Wellington Fund had provided the investor who bought its shares a proportional interest in a "balanced" multi-million dollar portfolio of securities. The Fund is committed to conservative investment policies with the stated and well publicized objectives of "conservation of principal, reasonable income return, and profits without undue risk". Through the purchase of Wellington Fund shares the small investor obtains the benefit of a diversification of holdings and a continuity of skilled management services that would otherwise be beyond his reach. Since this is an "open-end" fund, it continually offers to sell additional shares in the enterprise and to redeem outstanding shares. The attractive features of the fund and its success as an instrumentality for profitable yet conservative investment have been widely advertised, with Wellington Fund billed as "A Name To Remember When Investing". In brief, by 1958 Wellington Fund had become one of the largest and most highly regarded mutual funds, with nearly 250,000 shareholders and assets worth $750,000,000.
 
 
 15
 All of this was frankly recognized by the organizers of the new Equity Fund in their choice of a corporate name featuring "Wellington". Indeed, these organizers were members of the management group which was already engaged in promoting Wellington Fund and guiding its investments. They acted pursuant to their conviction that it would be good business to enable dealers marketing the balanced Wellington Fund also to have a common stock fund under their management available for less conservative investment by persons whose primary objective was growth of capital and increasing gain. They believed that the name "Wellington" would be valuable to the new enterprise, enabling it to benefit from the success and good reputation of Wellington Fund.
 
 
 16
 In these circumstances, the defendants do not deny the value of the Wellington name; rather, they argue that the right to exploit its good will in the investment company field belongs to the management company which itself bears the name Wellington and made that name popular and valuable through the skillful promotion and management it provided for Wellington Fund. This argument makes it necessary to determine whether it was the mutual fund itself or the associated management company which the investing public held in high esteem. This is a question of fact. The court below considered and disposed of this question, saying:
 
 
 17
 "Until entry into the field by Wellington Equity Fund in 1958, Wellington Fund has had the exclusive continuous use of the `Wellington' name in the investment company arena since 1935. Defendants' use of the name has been primarily in conjunction with investment advisory and underwriting services. The public's contact with the name `Wellington' has almost exclusively been with Wellington Fund. In fact, this Court was surprised when two of defendants' expert witnesses, particularly knowledgeable in the investment company field, could not name Wellington Fund's investment adviser. No greater knowledge can be imputed to the investing public. Further evidence `Wellington Fund' is the trade name that has achieved public acceptance and that the noninvestment companies bearing the `Wellington' name are little known to the investing public is borne out by the many corporate changes in name and in function that the noninvestment companies have undergone." 187 F.Supp. at 214.
 
 
 18
 Our own examination of the record satisfies us that the trial court's conclusion is adequately supported by evidence.
 
 
 19
 The additional contention that the advisory and promotional services of the management company added value to the name "Wellington" does not strengthen the defendants' position. These services were contractual undertakings performed for Wellington Fund. Their effective performance would necessarily create a favorable public image of the Fund and any investment opportunity it should sponsor. That reputation is no less the property of Wellington Fund because services or commodities obtained from others may have contributed to it. Cf. Radio Shack Corp. v. Radio Shack, Inc., 7th Cir., 1950, 180 F.2d 200. In return for conferring this benefit upon the Fund, Wellington Company received an agreed consideration in the form of management fees and sales commissions which, in the single year preceding the organization of the Equity Fund, aggregated more than two million dollars. It is entitled to nothing more, certainly not to treat as its own property the good will it created for its client.
 
 
 20
 Apart from these considerations peculiar to the organization and interrelation of the defendant corporations, the normal essentials of unfair competition are present in this case. "Wellington" had been established as the identifying name of a mutual fund. Danger of confusion is inherent in the adoption of that name by a new mutual fund. Although that danger is lessened to a degree by the fact that the new enterprise is a common stock fund while the older one is a balanced fund, the record shows that common stocks normally constitute more than half the value of Wellington Fund's portfolio. In such circumstances, there is substantial basis for apprehension that the ordinary investor will confuse the two enterprises, at least to the extent of attributing to Wellington Fund some sponsorship of the new fund bearing the Wellington name. The result is that Wellington can no longer be sure "that its reputation shall be of its own making alone." Time, Inc. v. Ultem Publications, Inc., 2d Cir., 1938, 96 F.2d 164, 165. Such appropriation of another's name and reputation "is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask. And so it has come to be recognized that, unless the borrower's use is so foreign to the owner's as to insure against any identification of the two, it is unlawful." Yale Electric Corp. v. Robertson, 2d Cir., 1928, 26 F.2d 972, 974. We think it is clear from what has already been said that in this case "the borrower's use is [not] so foreign to the owner's as to insure against any identification of the two".
 
 
 21
 We have not overlooked a contention of the defendants that there is no impropriety in the identification of the two enterprises in the public mind because both are now served by the same investment adviser. But, even so, situations may arise in which eventuation of the greater risks involved in the common stock fund will cause the investment experience of that fund to reflect unfavorably upon its supposed sponsor. Moreover, it is not required and should not be assumed in the adjudication of this controversy that the two funds will continue to employ the same investment adviser indefinitely. Indeed, the Investment Company Act of 1940 limits the duration of advisory contracts, empowers investment companies to terminate them at will and without cause, and requires periodic shareholder ratification of such contracts. 54 Stat. 812, 15 U.S. C. § 80a-15. We are satisfied that, in appropriating the Wellington name, the new Equity Fund is trading on the reputation of the pre-existing Wellington Fund in a way that is not legally permissible without the consent of Wellington Fund.
 
 
 22
 The defendants' final point presents entirely different considerations. Evidence was introduced to show that the directors of Wellington Fund, seeking to serve the interests of that corporation, consistent with the interests of the Wellington Company and the new Equity Fund, consented to the use of the name Wellington by the new corporation. It is argued that this action constituted effective consent by Wellington Fund. If this position is sound, the plaintiff stock-holders are also foreclosed, because they sue derivatively on behalf of Wellington Fund. Schleiff v. Baltimore & O. R. R., Del.Ch.1955, 130 A.2d 321.
 
 
 23
 Formal approval of the use of the name Wellington by the new common stock fund occurred at the September 25, 1958 meeting of the Board of Directors of Wellington Fund, although the proposal had been discussed and had evoked favorable comment at an earlier meeting. The resolution of the board read as follows:
 
 
 24
 "After full discussion of the matter and upon motion duly made, seconded and carried, it was
 
 
 25
 "Resolved, That the Board continues to be of the opinion that the use of the name `Wellington Equity Fund, Inc.' by that Corporation in connection with its common stock fund is in the best interests of Wellington Fund, Inc.,
 
 
 26
 "Further Resolved, That the prior action of the Board and of the officers in approving the use of the name `Wellington Equity Fund, Inc.' by that Corporation as a common stock fund is hereby formally reaffirmed, ratified, and approved;
 
 
 27
 "Further Resolved, That the proper officers of this Corporation be, and they hereby are, authorized to execute and deliver, in the name of this Corporation, to Wellington Equity Fund, Inc., any instruments of license, consent or approval which may be necessary or advisable, in their sole discretion, to evidence the approval of this Corporation, whether or not such approval may be required, of the use by Wellington Equity Fund, Inc., of that name."
 
 
 28
 As Wellington Fund shareholders, the present plaintiffs promptly protested that this action was improper and invalid.
 
 
 29
 In resolving this issue, the district court reasoned that under Delaware law a gift of corporate assets, unless made to a charitable corporation, required unanimous stockholder approval. See Frankel v. Donovan, Ch.1956, 35 Del. Ch. 433, 435 n. 2, 120 A.2d 311, 312 n. 2. The court then found that the directors' resolution was "nothing more than the gift of a valuable corporate asset." 187 F.Supp. at 211.
 
 
 30
 The defendants have strongly argued to us that the questioned action was not a "gift" of the right to exploit corporate good will but rather a licensing of the use of the Wellington name which in the best business judgment of the directors would benefit all concerned, including Wellington Fund itself. They contend that it was improper for the district court to substitute its evaluation of the transaction for the honest judgment of the directors.
 
 
 31
 It is true that courts of equity have refused to substitute their judgment for the judgment of independent and disinterested directors who have honestly concluded that a proposed disposition of corporate assets will result in a justifying benefit to the corporate transferor. Beard v. Elster, Del.1960, 160 A.2d 731. However, that rule does not apply when a majority of the directors are not disinterested in the proposed transaction. Kennedy v. Emerald Coal & Coke Co., Sup.Ct.1944, 28 Del. Ch. 405, 42 A.2d 398, cert. denied, 1945, 324 U.S. 872, 65 S.Ct. 1017, 89 L.Ed. 1426; Italo-Petroleum Corp. v. Hannigan, 1940, 40 Del. (1 Terry) 534, 14 A. 2d 401; Keenan v. Eshleman, Sup.Ct. 1938, 23 Del.Ch. 234, 2 A.2d 904, 120 A.L. R. 227. In this case, eleven of the thirteen members of the Wellington Fund board constituted the entire board of the new Wellington Equity Fund, which they authorized to use the Wellington name. When directors are thus interested in and obligated to both transferor and transferee, a court of equity is not obligated to accept the directors' judgment, but may and, indeed, should require them to prove to the court's satisfaction that the disposition of a valuable asset has been equitable. Geddes v. Anaconda Copper Mining Co., 1921, 254 U.S. 590, 599, 41 S.Ct. 209, 65 L.Ed. 425, cited with approval in Keenan v. Eshleman, supra, 23 Del.Ch. at 243-44, 2 A.2d at 908; Sterling v. Mayflower Hotel Corp., Sup.Ct.1952, 33 Del.Ch. 293, 298, 314, 93 A.2d 107, 110, 118-119, 38 A.L.R.2d 425; Kennedy v. Emerald Coal & Coke Co., supra, 28 Del.Ch. at 414-415, 42 A.2d at 402; Potter v. Sanitary Co. of America, Ch.1937, 22 Del.Ch. 110, 194 A. 87.
 
 
 32
 Turning to the merits of the directors' action, it is clear that the new corporation gave nothing to the Wellington Fund in exchange for permission to adopt the Wellington name as its own. But even though there was no consideration in a technical contractual sense, we have carefully examined the record for evidence of benefit to Wellington Fund as a result of the questioned transaction. Several witnesses did testify that some benefit to Wellington Fund was anticipated. In substance, their testimony was that a number of the independent securities dealers who handle the nationwide marketing of Wellington Fund shares had expressed a desire to be able to offer to their customers a common stock fund. Fear was expressed that, in a period when common stock funds were increasing in popularity, many dealers might lose interest in Wellington Fund unless they were enabled to offer to their customers a common stock fund under the management and sponsorship which had made Wellington Fund an attractive choice for investors interested in balanced funds. In addition, the actual experience of dealers since 1958 shows that both funds have prospered.
 
 
 33
 We think this line of proof falls short of the mark. It may be that the interest of dealers in Wellington Fund shares was enhanced by enabling them also to handle a common stock fund enjoying the same advisory services. But this does not establish that naming the new fund "Wellington" would be or was helpful to the pre-existing Wellington Fund. To the contrary, we think the inference is permissible that this choice of a name, as distinguished from the availability of a new common stock fund by whatever name, served to popularize the new Equity Fund, to its advantage and to the advantage of the advisory and promotional corporations which would earn substantial fees and commissions if the new venture should prosper. Particularly revealing was the testimony of W. L. Morgan, who organized Wellington Fund[3] and was the president, a director and sole owner of the common stock of Wellington Company. He said:
 
 
 34
 "It seems to me that if I spent money — Wellington Company spent money for twenty-five years advertising the name `Wellington', you [sic] would not want to call it [the new Equity Fund] Locust Street or something."
 
 
 35
 In brief, the services of the Morgan promotional and investment management organization having contributed to the good will of the Wellington name, it seemed sensible to use that good will in making the new venture profitable to that organization. Such testimony indicates the difficulty the Wellington Fund directors must have experienced in any effort to distinguish the interest of the shareholders of Wellington Fund from other interests which they also wished to promote.
 
 
 36
 In these circumstances, we cannot say that the district court was clearly wrong in finding as it did that "Wellington Fund was not the recipient of any discernible benefit", 187 F.Supp. at 212, from naming the new fund "Wellington". Consequently, the district court must be upheld in its rejection of this defense.
 
 
 37
 It remains to consider the plaintiffs' appeal from the refusal of the trial court to award them either damages or an accounting for profits. With reference to damages, the trial court found that it had not been proved that Wellington Fund had suffered monetary loss as a result of the existence or activity of Wellington Equity Fund. This conclusion is supported by evidence that sales of Wellington Fund shares and their value continued to increase in a substantial way after shares of Wellington Equity Fund were placed on the market. Conceding this continuing prosperity of Wellington Fund, plaintiffs have sought to avoid its impact by urging as a basis for their damage claim that, but for Wellington Equity Fund, it would have been possible for Wellington Fund to have enlarged its earnings by converting into a common stock fund. However, there is not the slightest indication in the record that such a conversion would have occurred had the new common stock fund not been in the field. There is no evidence that the shareholders of Wellington Fund were dissatisfied with its conservative type of investment or with its earnings. Certainly, the directors of Wellington Fund could not have changed the basic character and objectives of the Fund without the consent of the shareholders, even if they had wished to do so. See Investment Company Act of 1940, § 13(a) (3), 54 Stat. 811, 15 U.S.C. § 80a-13(a) (3). In brief, it does not appear that the existence of the new common stock fund was even a sine qua non of Wellington Fund's failure to earn larger profits. The denial of damages was clearly proper.
 
 
 38
 Turning to the matter of accounting, the plaintiffs do not argue that Wellington Equity Fund should account to Wellington Fund for enrichment attributable to the use of the Wellington name. The court below pointed out that any assignment of money value to such enrichment would necessarily be entirely speculative. Moreover, the beneficiaries of any such gain are the shareholders of Wellington Equity Fund who have done no wrong. What plaintiffs do ask is that they be granted an accounting for fees and commissions earned by the advisory and underwriting corporations, Wellington Company and Wellington Company, Ltd., in the management of Wellington Equity Fund investments and the sale of its shares. But any right to such an accounting must be predicated upon some breach of a fiduciary duty owed by these service corporations to Wellington Fund. With reference to Wellington Company, the court below rightly ruled that "plaintiffs' contention the investment advisory contract should be construed as providing for exclusivity of services simply has no foundation in the record." 187 F.Supp. at 216. A fortiori, Wellington Co., Ltd., which contracted to serve as underwriter for Wellington Equity Fund but was a stranger to Wellington Fund, had no fiduciary obligation to Wellington Fund in connection with the commissions it earned on sales of Wellington Equity Fund shares.
 
 
 39
 Where unfair competition has been proved, relief is fashioned pursuant to the equities of the case at hand, often with the result that the wrongful conduct is enjoined without any attendant award of monetary compensation. Champion Spark Plug Co. v. Sanders, 1947, 331 U.S. 125, 67 S.Ct. 1136, 91 L.Ed. 1386; National Van Lines v. Dean, 9th Cir. 1956, 237 F.2d 688. The nature and interrelation of various interests in this vigorously and ably contested case made the task of the trial judge, seeking an equitable resolution of the controversy, difficult. We think he achieved that objective by restraining the use of the Wellington name and refusing to award damages or to order an accounting.
 
 
 40
 The judgment will be affirmed.
 
 
 
 Notes:
 
 
 [1]
 A subsequent transfer of these functions from Wellington Co. to other corporations is of no present consequence
 
 
 [2]
 The court below discussed but did not decide whether Delaware law or so-called federal common law determined the legality of the challenged adoption of the name "Wellington". Nothing turns on that choice of law here. No relevant peculiarity of Delaware law appears in the cases. Rather, the Delaware courts in their search for controlling general principles of unfair competition have relied largely upon the body of law developed in federal decisions. See, e. g., American Radio Stores, Inc. v. American Radio & Television Stores Corp., 1930, 17 Del.Ch. 127, 130-131, 150 A. 180, 182. Cf. Hygienic Specialties Co. v. H. G. Salzman, Inc., 2d Cir. 1962, 302 F.2d 614, 619 n. 9. Nevertheless, we observe in passing that a strong case can be made for applying state law in situations of this kind, see National Fruit Product Co. v. Dwinell-Wright Co., D.Mass.1942, 47 F.Supp. 499, 502-504, aff'd, 1st Cir. 1944, 140 F.2d 618, as is done in diversity cases alleging unfair competition, Pecheur Lozenge Co. v. National Candy Co., 1942, 315 U.S. 666, 62 S.Ct. 853, 86 L.Ed. 1103. Moreover, the particular issues contested here — the legality of the adoption of part of the name of one Delaware corporation by another and the legal characterization of the conduct of the directors of the first corporation in consenting to the appropriation — may well be viewed as matters of special concern to the state of incorporation and peculiarly within its regulatory competence
 
 
 [3]
 Wellington Fund has grown from an investment pool for personal clients of Mr. Morgan, an investment counsellor, to one of the nation's largest mutual funds. Mr. Morgan continues to serve as president of the corporation and as a director
 
 
 
 41
 WILLIAM F. SMITH, Circuit Judge (dissenting).
 
 
 42
 This action is essentially one for unfair competition governed by common law principles. The majority holds that "the district court had federal question jurisdiction over the cause of action asserted under section 35(d) of the Investment Company Act of 1940, and pendent jurisdiction to determine whether the conduct in suit constituted common-law unfair competition." This holding is based on the view that the cited section creates an implied right enforceable in a private civil action in the district court. I disagree.
 
 
 43
 We are in accord with the majority view that in the proper case "a breach of statutory duty which causes injury to one of the class that the statute serves to protect affords by implication a sufficient basis for a private civil suit by the injured party." The principle is well established; however, in our opinion the express language of section 35(d), supra, precludes its application in the instant case.
 
 
 44
 The pertinent provisions of the cited section read as follows:
 
 
 45
 "It shall be unlawful for any registered investment company hereafter to adopt as a part of the name or title of such company, or of any security of which it is the issuer, any word or words WHICH THE COMMISSION FINDS AND BY ORDER DECLARES TO BE DECEPTIVE OR MISLEADING. The Commission is authorized to bring an action in the proper district court of the United States * * * alleging that the name or title of any registered investment company, or of any security which it has issued, is materially deceptive or misleading. If the court finds that the Commission's allegations in this respect, taking into consideration the history of the investment company and the length of time which it may have used any such name or title, are established, the court shall enjoin such investment company from continuing to use any such name or title." (Emphasis supplied).
 
 
 46
 The statutory prohibition is cast in specific terms which may not be disregarded. The section prohibits only the adoption of "any word or words which THE COMMISSION FINDS AND BY ORDER DECLARES to be deceptive or misleading." (Emphasis supplied). This is a clear expression of Congressional intent that illegality will attach to the conduct of a registered investment company only after such a finding and declaration by the Commission. The authority to enforce the prohibition by appropriate civil action is vested in the Commission.
 
 
 47
 We are of the opinion that the quoted provision cannot be construed as creating an implied right enforceable in a private civil action. Wilder Mfg. Co. v. Corn Products Co., 236 U.S. 165, 174, 35 S.Ct. 398, 401, 59 L.Ed. 520 (1915). The principle announced in the cited case is applicable here. "It is true that there are no words of express exclusion of the right of individuals to act in the enforcement of the statute or of courts generally to entertain complaints on that subject. But it is evident that such exclusion must be implied for a two-fold reason: First, because of the familiar doctrine that `where a statute creates a new offense and denounces the penalty, or gives a new right and declares the remedy, the punishment or the remedy can be only that which the statute prescribes.'" Ibid. See also Nashville Milk Co. v. Carnation Co., 355 U.S. 373, 378 and 379, 78 S.Ct. 352, 355, 2 L.Ed.2d 340 (1958). We are of the view that the federal question is not substantial and that under the cases cited in the majority opinion there is no basis for pendent jurisdiction.